IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

WILLIAM D. DAUGHTRY,      )
                                     )
        Plaintiff,       )
                                     )
      v.                 )     CIVIL ACTION NO. 1:06CV1118-SRW
                                     )            (WO)
MICHAEL J. ASTRUE, Commissioner  )
of Social Security,           )
                                     )
        Defendant.     )

## MEMORANDUM OF OPINION

Plaintiff William D. Daughtry brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

## BACKGROUND

On February 25, 2004, plaintiff filed an application for disability insurance benefits. On September 29, 2005, after the claim was denied at the initial administrative levels, an ALJ conducted an administrative hearing. The ALJ rendered a decision on June 23, 2006. The ALJ concluded that plaintiff suffered from the severe impairments of "cervical disc disease, lumbosacral disc disease, chronic obstructive pulmonary disease, and depression (not severe prior to age 50)." (R. 17). He found that plaintiff's impairments, considered in combination,

did not meet or equal the severity of any of the impairments in the "listings." (Id.). The ALJ found that the plaintiff "has the residual functional capacity to perform the exertional demands of sedentary work involving routine, repetitive tasks," that he is "precluded from working around exposure to hazards such as unprotected heights and dangerous equipment," and that he is "limited to work that is environment controlled from concentrated exposure to dust, fumes, gases and poor ventilation." (R. 17-18).

Plaintiff reached the age of 50 on December 7, 2005. The ALJ concluded that, before that time, plaintiff retained the residual functional capacity to perform jobs existing in significant numbers in the national economy and, thus, was not disabled within the meaning of the Social Security Act. He further concluded that, when plaintiff reached the age of 50, he became disabled by operation of Medical-Vocational Rule 201.14. On October 17, 2006, the Appeals Council denied plaintiff's request for review and, accordingly, the decision of the ALJ became the final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145.

2

Factual findings that are supported by substantial evidence must be upheld by the court.  The

ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity

attaches to the ALJ's determination of the proper legal standards to be applied.  <u>Davis</u>, 985

F.2d at 531.  If the court finds an error in the ALJ's application of the law, or if the ALJ fails

to provide the court with sufficient reasoning for determining that the proper legal analysis

has been conducted, the ALJ's decision must be reversed.  <u>Cornelius</u>, 936 F.2d at 1145-46.

## DISCUSSION

The issue before the court is whether the Commissioner's decision that plaintiff was

not disabled between September 5, 2003 (his alleged onset date) and December 7, 2005 (his

fiftieth birthday) is supported by substantial evidence.   The court has carefully reviewed all

of the evidence of record and finds that the resolution of this case depends on whether the

ALJ accorded proper weight to the opinions of plaintiff's treating pain management

specialist, Dr. Marsella, and the evidence on which Dr. Marsella relied in forming his opinion

regarding plaintiff's functional capabilities.

At the administrative hearing, plaintiff testified that he has constant pain in his neck,

between his shoulders, down his arms, in his lower back, through his hips and down both

legs.  (R. 416). He stated that the pain is a "dull, aching pain, that is occasionally "stabbing"

and sometimes numb and tingling.  Plaintiff testified that the pain gets worse anytime he does

"a lot" of "[a]ny type of movement," and that it is relieved by sitting or lying down.  He takes

methadone, hydrocodone, and Neurontin for pain; Dr. Marsella raised plaintiff's methadone

dosage the week before the hearing because the medication was not relieving his pain. (R.

417-18). Plaintiff testified that with the increased dosage he was not sleeping as well as before, and that the only other side effect he experienced from his medication was constipation, which he treated with over-the-counter medications. (R. 420). Plaintiff also testified that he experiences daytime drowsiness. (R. 428). Plaintiff admitted to smoking "an average of two packs a day" and that he lacks the willpower to quit smoking. (R. 421). He has shortness of breath and when he is "real highly active" he has "convulsions in [his] lungs." These attacks occur every two to three weeks, primarily in the spring and fall. Albuterol helps to slow the attacks, and plaintiff has no side effects from his breathing medication. (R. 422). Plaintiff testified that, due to his depression, his sleep is irregular, he is "irritated" and "down" and lacks concentration. (R. 423). According to plaintiff, he is able to walk "[m]aybe 10 feet" without a cane, and twenty to twenty-five feet with a cane. He is able to sit for about fifteen minutes and stand for four or five, and he cannot lift more than two or three pounds. (R. 424-25). Plaintiff testified that his wife helps him bathe and shave and that he does no chores. He sits on the couch and watches television, and tries to walk a little bit around his house, but mostly just sits on the couch and goes from the couch to the bedroom or bathroom. (R. 425). He lies down for two to three hours at a time "quite a bit" every day. (R. 428). He stopped attending church about four months before the hearing and cannot concentrate sufficiently to read. (R.426). Plaintiff testified that he has some tingling and numbness in his arm but is still able to "hold onto stuff." (R. 427). His main problem is with his legs and lower back. (Id.).

As noted above, the ALJ found plaintiff to suffer from the severe impairments of

"cervical disc disease, lumbosacral disc disease, chronic obstructive pulmonary disease, and depression (not severe prior to age 50)." (R. 17).

On April 30, 2001, Dr. Nicholas Voss – plaintiff's treating neurosurgeon – performed cervical surgery on plaintiff to treat a herniated disk at C5-6 which had caused right upper extremity radiculopathy. (R. 175, 178-79). The surgery resolved plaintiff's right arm pain. (R. 202). Plaintiff returned thirteen months later, complaining of a return of arm pain and a weak grip. An MRI showed a recurrent disk rupture at C5-6 and, on June 12, 2002, Dr. Voss performed a second cervical surgery, this time inserting a bone spacer and plate. (R. 162-63; 200-01). In July, plaintiff reported reduced pain in his right arm and, in August, reported that his right arm pain was mild and intermittent. (R. 198-99). In February 2003, Dr. Voss noted that plaintiff's cervical spine x-ray "look[ed] great" and that his alignment looked "great." (R. 197; see also R. 364 (Dr. Dungan's report that the cervical x-rays showed "stable good alignment," and that plaintiff "continues to have mild neck pain but there is no evidence of spondylosis above or below his fusion at C5 and C6)). On August 29, 2003, a week before plaintiff's alleged onset date, plaintiff reported that his neck was "popping and grinding," and that he had "some ache" in his left arm, in his back and down both legs. Cervical x-rays performed the next day did not identify any complications; Dr. Voss noted that "X-rays of the cervical spine look great." (R. 194-96).

Plaintiff repeatedly sought treatment for moderate COPD, bronchitis, and shortness of breath from Dr. Dean, a family practice physician, and Dr. Purvis, a pulmonary disease specialist, from the spring of 2001 until 2005. (Exhibits 8F, 10F, 24F). Plaintiff was

5

admitted to the hospital in December 2001 for exacerbation of COPD. (R. 243). Both physicians indicate through the course of plaintiff's treatment that he continues to smoke between one to two packs per day. (Exhibits 8F, 10F). Pulmonary function testing conducted in March 2002 showed "considerable obstruction with an FEV-1 of 44% of predicted and FVC of 67% of predicted or 1.82 liters and 3.36 liters respectively." Dr. Purvis noted that "FEV-1 to FVC ratio was 54%, consistent with moderate obstruction although I think this is underestimated given the severity of decrease of FEV-1." (R. 271). On September 12, 2002, plaintiff reported to Dr. Purvis that he had reduced his smoking with the assistance of a Nicotrol inhaler to one cigarette per day. However, by the time of his next appointment with Dr. Purvis six months later, he was "back to smoking pretty much as bad as he was doing before," due to "a lot of stress at Georgia Pacific managing safety situations in terms of chemical spills, etc." (R. 259-261). A pulmonary function test conducted in May 2004 as part of a consultative examination by Dr. Sam Banner indicated moderately severe airway obstruction. (R. 279-80). Dr. Banner noted wheezing on expiration and a prolonged expiratory phase. (R. 275).

Dr. Marsella diagnosed plaintiff with "[d]epression" on November 6, 2003. (R. 251). On a disability claim form completed the same day, Dr. Marsella checked a box to indicate – with regard to plaintiff's psychological functions – that plaintiff was "able to function in most stress situations and engage in some interpersonal relations (slight limitations)." (R. 309). On a disability claim form completed in January 2004, Dr. Marsella checked the box to indicate that plaintiff was "able to function under stress and engage in interpersonal

relations (no limitations)." (R. 304). On May 24, 2004, plaintiff was evaluated by Dr. Jacobs, a psychologist. He had not previously received psychiatric treatment other than medication prescribed by Dr. Dean and Dr. Marsella. (R. 282). Dr. Jacobs diagnosed plaintiff with "Major Depression, Recurrent, Mild" and "Nicotine Dependence." (R. 284). Plaintiff was treated at SpectraCare on January 24, 2006 and February 5, 2006 – approximately two months after he reached age 50 – for "major depressive disorder, recurrent, moderate." He reported that his pain level kept him from enjoying things, that he felt useless, and that he was grieving because a friend had recently committed suicide. (R. 393-94; Exhibit 26F).

    Plaintiff testified that his primary problems are with his lower back and legs. (R. 427). Plaintiff was treated by Drs. Hall and Dungan of Southern Bone & Joint Specialists in late 2002 and early 2003 for complaints of back, hip and leg pain. On September 4, 2002, Dr. Hall indicated that his impression was "Meralgia paraesthetica, greater trochanteric bursitis, normal left hip exam and possible avascular necrosis" as the source of plaintiff's left leg pain. He recommended an MRI of plaintiff's left hip. (R. 378-80). The MRI was normal, and Dr. Hall asked Dr. Dungan to evaluate plaintiff for possible left leg meralgia paresthetica. (R. 377). Dr. Dungan evaluated plaintiff on October 2, 2002. She noted that review of a previous MRI (see R. 171-72) revealed "congenital stenosis at L2 and L3" but that plaintiff had no difficulty with ambulation or with maintaining his job. Her impression was "low back pain at L5, myofascial pain" and "[m]eralgia paresthetica with previous success with block vs. L2-3 congen[it]al stenosis, pinching on the spinal outlet nerve." She

treated plaintiff with injections. (R. 373). Dr. Dungan treated plaintiff for low back pain in

October, November and December 2002 with a Botox injection, lumbar epidurals, and

Neurontin. (R. 368-70). Dr. Dungan's impression in December was "[l]ateral femoral

cutaneous nerve neuropathy with ongoing paresthesias and pain additionally complicated

by L2-3 spinal stenosis." (R. 368). The following month, she performed an EMG and nerve

conduction study which caused her to rule out lateral femoral cutaneous neuropathy as the

cause of his pain. Dr. Dungan indicated that her impression was "L3–4 paraspinal nerve

irritation with mild amount of abnormal spontaneous activity which appears acute" and

stated that she suspected his pain was related to L2-3 spinal stenosis. Dr. Dungan stated,

"I would like to have the patient reviewed by Dr. Voss. The possibility of a CT myelogram

of the lowers to make sure the spinal stenosis combined with his bulging discs are not

causing more problems than would be suggested by them independently." (R. 365). On

February 7, 2003, Dr. Dungan transferred plaintiff's care to Pain Management. (R. 362-64).

Dr. Voss examined plaintiff on February 17, 2003. Dr. Voss stated:

I have carefully reviewed an MRI performed in August 2002, and I believe
that it looks pretty good. There is a disk bulge on the left at L4-5 within the
foramen which is very mild. There is still fat around the nerve root at this
level. He now has bilateral leg pain but it is worse on the left. Apparently
Dr. Bruce Hall has seen him and told him that he has bursitis of the left hip.
Dr. Bonnie Dungan has seen him and performed some EMG nerve conduction
studies which show irritability in the L3 and L4 distribution resulting in her
suggesting the possibility of spinal stenosis being a cause.

On exam, I find nothing specific. There is no neurologic deficit. Knee jerks
bilaterally are brisk at 2-3+. Ankle jerks are 2-3+. Straight leg raising and
femoral stress stretching are no more painful than internal and external
rotation of the hip or flexion of the knee and hip simultaneously. He certainly
does not have the classic nerve stretch irritation signs. There is no specific

sensory loss. I would like for him to undergo a lumbar myelogram, although I have told him that we may not be able to explain this based on lumbar spine pathology.

(R. 197).

The lumbar spine myelogram was performed on March 7, 2003 and showed a slight ventral impression on the thecal sac at L2-3, L3-4, and L4-5, but was otherwise unremarkable. A CT scan performed on the same day showed a mild diffuse disc bulge and protrusion at L4-5 ventral and extending laterally into the inferior portions of the intervertebral foramen bilaterally, but was also otherwise unremarkable. Lumbar x-rays showed slight anterior wedging of T12-L1 (R. 165-69). After the diagnostic procedures, Dr. Bruce Woodham, a physician in the neurosurgery practice with Dr. Voss (see R. 161), saw plaintiff on follow-up on March 13, 2003. Dr. Woodham noted plaintiff's complaints of popping in his neck and his "primary problem" of "low back pain, left hip numbness, left neg numbness, left leg pain, shaking all over, et cetera." (R. 183). Dr. Woodham stated:

> PHYSICAL EXAMINATION: This is an unbelievable examination because he sits here and looks comfortable, but when he gets up he begins to shake and jump; he has his back in a rigid position. He says he has horrible pain when he extends or when he sits.
>
> Dr. Voss had seen him on 02/17/2003 and offered him myelography. The myelogram he said looked great. You can make a case for lateral disc bulges, but his pain is out of proportion to that I believe.
>
> He does not have any findings. No reflex asymmetry or motor weakness, or those kinds of things.
>
> IMPRESSION: I am suspicious that something else is going on. I just do not know if he has a workers' compensation claim or whether or not there is a law suit or something else going on, but this does not seem to fit. It just does not smell right.

RECOMMENDATION: I did off discography for him.  He is not interested in that.  At this time, he is going to physical therapy with a chiropractor and he is also to be seen at the pain clinic.  It seems a bit strange to me that he has so many symptoms, yet such a clean examination with what I think is a relatively normal myelogram.  I have not explored the other potentials with him, but we will continue to think about that.

(R. 183).  He continued, "I do know that Mr. Daughtry continues to work.  He tells me he is working mostly at a computer now, not doing any heavy work, et cetera."  (R. 182).

Dr. Marsella first treated plaintiff on January 29, 2003 or February 14, 2003.  (R. 316, 354).[1]  He next treated plaintiff on June 13, 2003.  Plaintiff reported moderate lower back pain and right and left leg pain, aggravated by weight bearing and spine loading and relieved by rest.  Dr. Marsella diagnosed lumbar radiculitis and spinal stenosis and recommended a nerve root block.  (R. 256).  Plaintiff returned for the nerve root block on July 10, 2003.  Dr. Marsella noted a sensory deficit in plaintiff's left lateral thigh, but motor strength of 5/5 on both left and right. (R. 255).  On August 15, 2003, plaintiff reported increased pain in his lower back and numbness and weakness in his left arm.  Dr. Marsella noted decreased grip strength in plaintiff's left hand.  Dr. Marsella prescribed Lortab and referred plaintiff back to Dr. Voss for evaluation of his neck and lower back. (R. 253).[2]  On August 29, 2003, Dr. Marsella noted that plaintiff had a worsening gait.  He diagnosed cervicalgia and lower pack pain (R. 252).  Dr. Marsella referred plaintiff to rehabilitation

---

[1]  Dr. Marsella has indicated the first date of treatment to be both January 29, 2003 (see R. 354) and February 14, 2003 (R. 316).  The administrative record before the court does not contain notes from a January 2003 evaluation or for treatment on February 14, 2003.  (See R. 256)(indicating previous visit occurred on 2/14/03).

[2]  As noted above, Dr. Voss evaluated plaintiff on August 29, 2003, ordered cervical x-rays, and reported that the x-rays "look[ed] great."  (R. 194-96).

for a functional capacity evaluation, which was conducted by physical therapist Alfonso

Castro on September 4, 2003.   By report dated September 5, 2003, Castro advised Dr.

Marsella as follows regarding plaintiff's functional capacity:

> FUNCTIONAL ABILITIES
>> Evaluee demonstrated ability to perform the following Lifting activities at the **Sedentary level**: Mid Lift, Full Lift.  Evaluee is able to perform the following activities on a **Constant basis**: Reach immediate (R); on a **Frequent basis:** Reach Immediate (L), Handling (L), Handling (R), Fingering (L), Fingering (R), on an **Occasional basis:** Walk, Push Cart - 40 Lb, Push Cart - 100 Lb, Pull Cart - 40 Lb, Climb Stairs, Sitting, Standing.
>
> FUNCTIONAL LIMITATIONS
>> Evaluee did not demonstrate ability to perform the following activities: Carry - 10 Lb, Carry - 20 Lb, Carry - 50 Lb, Pull Cart - 100 Lb, Stoop, Crouch, and Kneel.
>
> CONCLUSIONS
>> Mr. Daughtry current[ly] demonstrates the ability to perform in the SEDENTARY physical demand level consistent with the functional abilities listed above.  He current[ly] shows much weakness in his legs and lumbar spine and severe balance instability from those deficits.  He is not presently able to engage in any activity requiring carrying and prolonged standing.  His gait shows much instability and weakness.  He also shows decrease in AROM in the right shoulder as well as weakness by 38% below functional level.  The results of this evaluation show that Mr. Daughtry requires assistance for his daily routine.  He would benefit from physical therapy to work on his deficits and to bring him to a safe functional level and avoid more falls.

(R. 208).  On September 15, 2003, Castro evaluated plaintiff's spinal range of motion and

used automated impairment rating software to calculate plaintiff's percentage of impairment

at 8% for plaintiff's cervical spine, 15% for his lumbar spine, and 22% for his whole body.

(R. 311-15).  On September 26, 2003, Dr. Marsella noted stiffness in plaintiff's lower back

and an antalgic gait.  He diagnosed stenosis and lower back pain.  (R. 227).

Dr. Marsella's treatment notes for November 6, 2003 reflect plaintiff's complaints of pain at a level "7" (moderate pain) in his lower back and left leg.  Dr. Marsella noted that plaintiff is "temporarily disabled" and has hypertension, sleep dysfunction and COPD.  He noted that plaintiff was walking with a cane and had decreased feeling in his anterior left thigh, and muscular strength of 5/5 in both his upper and lower extremities.  He diagnosed lumbar radiculitis and depression.  (R. 251).  On the same day, Dr. Marsella completed a disability claim form for plaintiff's disability insurer.  He noted plaintiff's subjective symptoms of "pain in neck and low back," his diagnoses of spinal stenosis, chronic low back pain and cervicalgia.  In a section of the form asking for "objective findings," and stating "Include copies/results of any x-rays, lab tests, EKG's MRI's, scans and office notes," Dr. Marsella wrote "MRI - congenital spinal stenosis."  He indicated that plaintiff is able to: (1) sit for three hours, stand for two and walk for one; (2) climb, (3) operate a motor vehicle; (4) repetitively perform fine finger movements, eye/hand movements, and pushing and pulling with both his right and left hand; and (5) lift/carry up to 10 lbs occasionally.  He indicated that plaintiff cannot twist, bend, stoop, reach above shoulder level, or lift/carry more than ten pounds.  He stated that plaintiff is unable to perform job duties because he is "unable to sustain activity greater than 2 hours at a time [without] rest" and that he can work a total of 2-4 hours per day at the sedentary level.  He noted that he does not expect improvement.  (R. 308-09).

In an office visit on December 1, 2003, plaintiff reported that his pain level had

decreased to a "5." He indicated that he had experienced erectile difficulty after starting a medication (Efflexa) and that his legs shake when he stands. Dr. Marsella discontinued prescription for Efflexa. He noted no new physical findings and again diagnosed spinal stenosis and lumbar radiculitis. The office note indicates that plaintiff's work status is "permanently disabled." (R. 250). On a disability form completed the next day, Dr. Marsella wrote "unknown" for plaintiff's expected return to work date. He listed diagnoses of spinal stenosis and low back pain, and under "objective findings" wrote, "Pain in neck, low back & legs[.]" In response to a question about whether plaintiff could work with job modifications or restrictions, he wrote "see attached FCE summary." (R. 307).

On January 19, 2004, plaintiff reported increased pain (level "7") in his lower back, left leg, and both shoulders, and sensory loss and bilateral leg spasms. He stated that his legs were shaking, and that he had muscle pain and weakness. Dr. Marsella noted new physical finding of dysesthesia in plaintiff's left thigh and allodynia.[3] Dr. Marsella indicated his assessment of "Congenital Stenosis - Lumbar spine," added a prescription for Methadone, and ordered an MRI of plaintiff's lumbar spine. (R. 249). On January 28, 2004, Dr. Marsella completed a disability form which was identical to the one he had completed two months earlier. As discussed above, he noted improvement in plaintiff's psychological function. His evaluation of plaintiff's physical capabilities remained substantially the same as on November 6, 2003. (R. 303-05).

The MRI ordered by Dr. Marsella was performed on February 6, 2004. The findings

---

[3] Allodynia is a "[c]ondition in which ordinarily nonpainful stimuli evoke pain." *Stedman's Medical Dictionary* (26th ed.), p. 50.

were:

> Mild dessication of the L4-5 disc without significant disc bulge. No other significant abnormalities noted at the other levels. No significant stenosis or nerve root compression.

(R. 302). The radiologist's impression was "mild dessication at the L4-5 disc, otherwise negative." In an office visit on February 19, 2004, plaintiff reported lower back, left leg and bilateral shoulder pain at a level "6," motor loss, sensory loss, muscle pain and weakness, and bilateral leg tremors. Dr. Marsella did not list any new physical findings and indicated his assessment of degenerative disc disease at L4-5. (R. 248). On April 2, 2004, Dr. Marsella completed a disability form for plaintiff's pension fund listing objective findings of "Disc Dessication L4-5 (MRI 2/6/04)" and "congenital spinal stenosis L2-3 (MRI 8/1/02). He indicated that plaintiff's condition was unimproved. The form instructed the physician to review a list of jobs within the collective bargaining unit and inquired whether plaintiff was totally disabled from performing "work in a position within the collective bargaining unit of the Employer with which he/she was last employed and to which he/she is contractually entitled." Dr. Marsella checked the block to respond "Yes." With regard to plaintiff's return to work, of choices "approximate date," "indefinite" and "never," Dr. Marsella selected "indefinite." (R. 353-55).

On May 19, 2004, Dr. Sam Banner performed a consultative examination. He noted muscle strength in upper and lower extremities of 4/5 "due to pain," diminished sensation in both lower extremities, and diminished reflexes. He recorded that plaintiff was unable to perform squatting or heel/toe walk and that, without his cane, he "had to hold to exam

table with six-inch steps taken." However, he noted that "[t]here was no atrophy of any muscle group in upper or lower extremities," and that "[m]uscle tone was normal." (R. 273-76).

The record contains no office notes for treatment by Dr. Marsella between the February 19, 2004 office visit and December 30, 2004.[4] On December 30, 2004, Dr. Marsella evaluated plaintiff for complaints of severe pain (level "9") and, on physical examination, noted audible wheezes. Dr. Marsella changed plaintiff's dosage of Methadone and continued his Lortab prescription. (R. 345-46). On that day, he also signed a disability insurance form, checking blocks to indicate that plaintiff was totally disabled from any occupation and was not a suitable candidate for rehabilitation. (R. 300-01).

On February 5, 2004, plaintiff reported cervical pain radiating to his upper extremities and lower back pain radiating to his lower extremities. He rated his pain level at "3" with an average of "2." (R. 344). On March 17, 2005, he reported that his pain had increased to a level of "7-8" with the average being "4-5." Plaintiff remained on Lortab and Methadone. On physical examination, Dr. Marsella noted "3+ wheezing." (R. 341). He assessed plaintiff with failed cervical surgery and low back pain. He noted that plaintiff reported that medical management "improves activity," "decreases pain," "improves quality of life," and caused "no side effects." (R. 342). On April 12, 2005, plaintiff reported pain at level "7" with an average of "8." He again indicated that medical management improved

---

[4] Plaintiff bore responsibility for providing this evidence to the ALJ. See Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003); see also R. 408-410 (ALJ held the record open for thirty days to allow counsel to submit any additional records). Plaintiff apparently saw Dr. Marsella on September 30, 2004 (see R. 383); however, there is no treatment note in the record for that visit.

activity, decreased pain, improved quality of life and caused no side effects.  (R. 334-35).

By letter dated May 4, 2005, Dr. Marsella summarized the results of plaintiff's September 4, 2003 functional capacity assessment for the benefits administrator for plaintiff's disability insurance plan.  He stated:

> Based on his Functional Capacity Evaluation on that date, his functional limitations included carrying anything heavier than ten pounds, pulling a cart, stooping, crouching and kneeling.  He was unable to perform balancing, stooping, kneeling, crouching or crawling.   He was able to perform most other sedentary activities on an occasional basis.  The overall conclusion is that he demonstrated the ability to perform at sedentary physical demand level.  It is my opinion that he would not be able to return to full time employment based on restrictions as outlined above.

(R. 347).

On May 17, 2005, plaintiff reported that his pain decreased to a level "6" with the increased dosage of Methadone.  (R. 326-27).  On July 19, 2005, plaintiff reported a pain score of "8-9" and complained of dizziness.  Dr. Marsella noted expiratory wheezing. (R. 323) He again indicated that the patient reported that medical management improved activity, decreased pain, improved quality of life and caused no side effects.  He further checked a block to note that plaintiff's "[s]ubjective complaints exceed objective findings." (R. 324).  On July 26, 2005, Dr. Marsella signed a statement on which he had indicated that plaintiff was disabled for any occupation from 9/5/03 to 8/18/05.  (R. 349).  On August 18, 2005, plaintiff reported a pain level of "7."  Dr. Marsella added a prescription for Lunesta,[5] noted the same positive effects and lack of side effects from medical management.  (R. 320-

---

[5]  "Lunesta is indicated for the treatment of insomnia." *Physician's Desk Reference* (62nd ed. 2008), p. 3077).

21).  The record contains no office notes for treatment from Dr. Marsella between August 18, 2005 and January 11, 2006.   On that date, plaintiff reported pain on a level of "7-8," stress and increasingly worse depression.  Dr. Marsella observed a "very flat affect."  He prescribed Lexapro.  Plaintiff again reported that medical management improved activity, decreased pain, improved quality of life and caused no side effects.  (R. 385-86).

The ALJ rejected Dr. Marsella's opinion that plaintiff is unable to work full time, stating that it is not consistent with the credible evidence of record.  He noted that the plaintiff's "essentially normal" examinations do not support extreme limitations and that the objective findings such as the MRI findings and EMG findings do not support a finding of disability prior to age 50.  (R. 21).

"If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight."  Roth v. Astrue 2007 WL 2782051, *1 (11th Cir. Sep 26, 2007)(unpublished opinion)(citing 20 C.F.R. § 404.1527(d)(2)).  "If the treating physician's opinion is not entitled to controlling weight, . . . 'the testimony of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary.'"  Id. (citing Crawford v. Commissioner, 363 F .3d 1155, 1159 (11th Cir. 2004)).   The Eleventh Circuit has found good cause for discounting a treating physician's report when the report "'is not accompanied by objective medical evidence or is wholly conclusory.'"  Crawford, supra (quoting Edwards v. Sullivan, 938 F.2d 580, 583-84 (11th Cir.1991)).

Additionally, there is good cause where the treating physicians' opinions are "inconsistent with their own medical records," Roth, supra (citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997)) or "when the opinion appears to be based primarily on the claimant's subjective complaints of pain." Freeman v. Barnhart, 2007 WL 861140, *2 (11th Cir. Mar. 23, 2007)(citing Crawford, supra).

Dr. Marsella's treatment notes generally record plaintiff's complaints and vital signs, but often include little in the way of specific clinical observations or findings. In the forms he completed on November 6, 2003 and January 28, 2004 setting forth plaintiff's functional limitations, Dr. Marsella indicated that the objective evidence upon which he based his opinion was the MRI showing congenital spinal stenosis. (R. 303, 308). However, Dr. Voss – plaintiff's treating neurosurgeon – "carefully" reviewed this same MRI and concluded that it looked "pretty good." (R. 197). On February 17, 2003, several months after the August 2002 MRI showing mild congenital spinal stenosis, Dr. Voss examined plaintiff and found no neurologic deficit and no specific sensory loss. The ALJ could reasonably conclude from Dr. Voss' treatment note on that date that Dr. Voss did not find the August 2002 MRI to provide an explanation for plaintiff's symptoms. He stated, "I would like for him to undergo a lumbar myelogram, although I have told him that we may not be able to explain this based on lumbar spine pathology." (R. 197). Dr. Woodham reported that Dr. Voss had stated that the myelogram "looked great." (R. 183).[6] On March 13, 2003, Dr. Woodham

---

[6] Plaintiff's counsel suggests that Dr. Woodham's statement is contrary to the objective evidence and that he did not mention the recent CT scan or the lumbar spine x-ray. (See R. 401). Dr. Woodham was in practice with Dr. Voss, and his failure to mention these tests by name does not suggest that he was unaware of them. The CT scan revealed a lateral disc bulge. Dr. Woodham's treatment note clearly

found that plaintiff did not have "any findings." He stated, "It seems a bit strange to me that he has so many symptoms, yet such a clean examination with what I think is a relatively normal myelogram." (Id.). Thus, several months after the MRI upon which Dr. Marsella relied, two neurologists found no neurological deficits on examination and one of them, upon "careful" review of the MRI, did not find it to explain plaintiff's symptoms. See 20 C.F.R. § 1527(d)(5)(Commissioner gives "more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). Since the objective evidence upon which Dr. Marsella relied does not – according to plaintiff's treating neurologists – explain plaintiff's symptoms, it appears that Dr. Marsella's opinion regarding disability is substantially based on plaintiff's subjective complaints.

Additionally, plaintiff's medical condition – as revealed by objective testing – did not deteriorate significantly between the time of Dr. Woodham's assessment and September 5, 2003, the date that plaintiff became disabled, according to Dr. Marsella. When Dr. Woodham examined plaintiff and found his asserted symptoms to be out of proportion to the objective evidence, the CT scan showed a mild diffuse disk bulge and protrusion at L4-5. The lumbar spine MRI ordered by Dr. Marsella in February 2004 showed only mild dessication of the L4-5 disc without significant disc bulge, and with no significant stenosis

_____

demonstrates that he was aware that plaintiff had a lateral disc bulge. (See R. 183)("You can make a case for lateral disc bulges, but his pain is out of proportion to that I believe."). Additionally, in his August 29, 2003 notes, Dr. Voss indicated that myelography in the spring of 2003 "showed the nerve roots in the cervical lumbar region to be clean and clear and the disks to be okay." (R. 195). The myelogram was of the lumbar spine, not the cervical spine. (R. 167).

or nerve root compression.

In a consultative examination conducted on May 19, 2004 – over eight months after plaintiff allegedly became disabled from debilitating pain – Dr. Sam Banner noted normal muscle tone and no atrophy of any muscle group in plaintiff's upper or lower extremities. (R. 276).

Dr. Marsella apparently also relied heavily on the functional capacity evaluation performed by physical therapist Castro. See R. 347; see also R. 316(Marsella indicated in a form signed on 9/11/03 that he would need an FCE to render an opinion on plaintiff's ability to work with job modifications or restrictions); R. 307 (referencing "attached FCE summary" in response to question regarding whether plaintiff could work with job modifications or restrictions). The ALJ considered the physical therapist's report of the functional capacity evaluation (see R. 21) but, as noted above, concluded that the plaintiff's "essentially normal examinations" and the results of objective testing did not support plaintiff's asserted extreme limitations. The opinions of physical therapists are not controlling or given great weight for the purpose of establishing residual functional capacity. See 20 C.F.R. § 404.1513 (opinions of physical therapist may be considered in assessing residual functional capacity, but a physical therapist is not an "acceptable medical source").

Dr. Marsella makes a diagnosis of "failed cervical surgery" in an office visit on March 17, 2005, during the relevant period, but he cites no objective evidence demonstrating failure of the second cervical surgery. (R. 342). On July 19, 2005, also during the period under consideration, Dr. Marsella indicated that plaintiff's "[s]ubjective

complaints exceed objective findings." (R. 324).

Additionally, Dr. Marsella generally agrees that plaintiff is able to perform the physical demands of sedentary work, with limitations (see R. 347), but adds that he is unable to sustain activity for more than two hours without "rest" or "interruption" and that he can work only two to four hours per day. Dr. Marsella does not explain the basis for this durational limitation. The court concludes that the ALJ has demonstrated good cause for rejecting Dr. Marsella's opinion that plaintiff is unable to maintain full-time employment.

Plaintiff further argues that the ALJ's RFC assessment was arbitrary and not supported by substantial evidence because the record contains no opinions contradicting Dr. Marsella's opinion as to plaintiff's functional limitations. However, the claimant bears the burden of establishing that he is disabled. Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005)(citation omitted). As noted above, the ALJ demonstrated good cause for discrediting Dr. Marsella's opinion regarding plaintiff's limitations. Once he did so, he was entitled to rely on other evidence of record, such as Dr. Woodham's and Dr. Voss' notes suggesting that the objective testing did not support the limitations asserted by the plaintiff, in determining plaintiff's residual functional capacity.[7] See Green v. Social Security Administration, 2007 WL 1265988 (11th Cir. May 2, 2007)(rejecting similar argument).[8]

---

[7] Plaintiff makes no specific arguments regarding the ALJ's credibility determination. The court concludes that it is supported by substantial evidence. (See R. 18-20).

[8] Plaintiff further argues that ALJ's RFC assessment is flawed because the physical therapist's FCE demonstrates that plaintiff cannot carry at all and the definition of sedentary work requires some ability to carry. However, Dr. Marsella concluded, upon review of the FCE, that – with regard to carrying – plaintiff's "functional limitations included carrying anything heavier than ten pounds[.]" R. 347. He does not indicate that plaintiff is unable to carry at all. Id.

## CONCLUSION

Upon review of the record as a whole, the court concludes that the decision of the Commissioner is supported by substantial evidence and is due to be AFFIRMED. A separate judgment will be entered.

Done, this 8th day of January, 2008.


/s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE